UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-----------------------------------------------------------X
JAMES G. PAULSEN, Regional Director of
Region 29 of the National Labor Relations Board,
for and on behalf of the NATIONAL LABOR
RELATIONS BOARD,

                                        Petitioner,

                    -against-

CALHOUN FOODS, LLC, d/b/a/ KEY FOOD,

                                        Respondent.
-----------------------------------------------------------X

APR 2 5 2012

NOT FOR PUBLICATION
**MEMORANDUM & ORDER**
12-cv-0931 (CBA)

**AMON, Chief United States District Judge**.

## INTRODUCTION

James G. Paulsen, the Regional Director of Region 29 of the National Labor Relations Board, petitions the Court for a preliminary injunction under § 10(j) of the National Labor Relations Act ("NLRA"). Currently pending before Administrative Law Judge Lauren Esposito are petitioner's claims that respondent Calhoun Foods violated (1) Section 8(a)(1) of the NLRA by interrogating employees and creating the impression that their union activities were being kept under surveillance; and (2) Section 8(a)(5) of the NLRA by refusing to bargain with Local 338, Retail Wholesale and Department Store Union, United Food and Commercial Workers ("the Union"). Petitioner seeks an injunction restraining respondent from further violations of § 8(a)(1) and directing it to bargain with the Union as required under § 8(a)(5).

On February 28, 2012, the Court ordered respondent to show cause why it should not grant the relief requested. The Court heard oral argument on the petition on March 26, 2012. Having reviewed the parties' submissions and the underlying administrative record, the Court concludes

1

that petitioner has established reasonable cause to believe that respondent has committed labor violations and that injunctive relief is just and proper.  The petition is granted.

## BACKGROUND

The parties have agreed that this petition be decided on the administrative record developed before the Administrative Law Judge and several additional documents submitted by the parties. The following facts are drawn from those materials.

This labor dispute arises out of the change in ownership of a supermarket at 135-46 Lefferts Boulevard in Queens, New York.  In late April 2011, Sam Hassen and his father Abdel Hassen, principals of respondent, purchased a Foodtown from PSK Supermarkets, Inc. and shortly thereafter began to operate it as a Key Food.  Prior to the sale, the employees of the Foodtown were represented by the Union, and the Union and PSK were parties to a collective bargaining agreement that was to be in effect from July 1, 2006 until September 30, 2011.

When the Union found out that the Foodtown had been sold, it sought to continue its representation of employees working at that location.  According to petitioner, on April 26, 2011, Jeff Laub, a union representative, went to speak with Mike Hassen, Sam Hassen's brother, at another Key Food on Lefferts Boulevard. Tr. 91.  Mike was the owner of this Key Food, and apparently the Union believed that he was an owner of the new Key Food also.  According to Laub's testimony, Laub told Mike that the Union had been representing the employees at Foodtown for a long time and that he wanted to set up a time to negotiate a collective bargaining agreement with respect to the new Key Food. Tr. 93.  Mike allegedly told Laub he could not afford a Union. *Id.*   Laub gave Mike his card and left the store. *Id.*   Mike denies that this encounter occurred. Tr. 200.

Petitioner claims that on April 29, 2011, Laub and Jack Caffey, another union representative, went to the new Key Food to again seek recognition of the Union. Tr. 35.  The store was not yet open for business at that time. Tr. 44.  According to Caffey's testimony, he spoke with Sam Hassen, who all agree is a part-owner of the store.  Caffey testified that his conversation with Sam, in relevant part, was as follows:

> Then, we started talking about the employees in the particular store and that's when I told Sam that, you know, we were demanding recognition because we had the majority of the employees in there, 15 to 17 employees, I don't know exactly, at that point.  And he told me that there was only 12 employees, total, in that store, which anybody knows the business, knows that store can't operate with 12 people.
>
> . . . .
>
> As far as the recognition, I told him that, you know, we really need to sit down and negotiate a particular contract.  And, when I said that to him, he said that he couldn't afford the contract.  I asked him what contract he was talking about, he said the Foodtown contract.  And, I stated to him that it doesn't have to be the Foodtown contract, that we can negotiate a contract that works for both the union and also the new owners.  And, at that point, he said that he would have to speak to Mike Hassen.  And, I told him that, you know, we're here now, you know, can we speak to Mike Hassen.  And, he said that he wasn't there.
>
> So I told him that we'd like to speak to him sooner rather than later because we have the employees that are going to be working in the store – are working in the store and that, you know, we were getting many, many phone calls that they wanted to be under a contract and they wanted to have the union. So I told him that by next Friday, you know, please contact Mike Hassen and get back to me as soon as possible. Tr. 36-37.

Caffey left his card with Sam. *Id.*  Sam testified at the Administrative hearing that a conversation with Caffey did occur, but he denies that Caffey demanded recognition and negotiation. Tr. 213. The Union and the Hassens did not engage in negotiations.

Shortly thereafter, the Union began distributing leaflets asking shoppers not to patronize the Key Food because it was a non-union store. Tr. 50; R. ex.1.[1]  It also filed a petition on June 14,

---

[1] Exhibits in the administrative record are designated with the initial "R." for respondent's exhibits, "P." for petitioner's exhibits, and "J." for joint exhibits.  Exhibits attached to the petition are designated with the abbreviation "Pet."

2011 with the National Labor Relations Board ("NLRB" or "the Board") for certification as the exclusive collective bargaining agent of respondent's employees. J. ex.1. The form for the petition was filled out by Nelson Resto, another union representative. Tr. 55. Although it is not entirely clear why, Resto left blank the portion of the form asking whether and when a demand for recognition had been made. J. ex.1.

The Regional Director approved a stipulation setting a Board-administered election for July 26, 2011. R. ex.4. On June 28, 2011, nearly a month before the election, respondent turned over the *Excelsior* List—a list of all employees eligible to vote in the election—which reflected forty-six current employees, fifteen of which were former Foodtown employees. R. ex.10; Tr. 217. A week later, on July 6, 2011, the Union filed one of the complaints at issue in this action with the NLRB, alleging that respondent's refusal to negotiate violated § 8(a)(5) of the NLRA. On July 22, 2011, just days before the election, the Union moved to withdraw the petition for certification. The Board granted this request over respondent's opposition.

Meanwhile, according to petitioner, respondent had been interrogating employees about the Union and surveilling their union activities. The only specific instances of such behavior in the record relate to an employee named Nadira Mangal. Mangal testified that on June 17, 2011 she was called into Sam's office. Tr. 122-23. According to Mangal, Sam told her that he knew she was helping the Union get employees to fill out union authorization cards and asked how many the Union had given her to get filled out. Tr. 123. Sam further told her that he had "an insider with the union, who gives them a list of names of people who already filled out the cards." *Id.* Sam related that "at [his] first previous store, [he] had a union and he approach the workers and he ask the workers, do you want to take home a big check, or you want a union to take your $35. And, these workers say that they want a big pay check." *Id.* He then told Mangal that he could

4

give her more hours, but that she would have to go tell the Union that the workers did not want them to be their representative. *Id.* Sam denies that this conversation occurred. Tr. 219.

Mangal claims that a few days later, on June 19, 2011, Sam called her away from her cash register to speak with her. Tr. 124-25. He told her that the bookkeeper had observed her writing down employees' schedules. *Id.* She replied that she had written down only her own schedule. *Id.* Sam then asked her to produce her schedule, which she said was at home. *Id.* He then directed her to return to her register. *Id.* Sam admits that this conversation occurred but claims that he was simply addressing a complaint from another employee. Tr. 220. On June 28, 2011, the Union filed a complaint with the NLRB alleging that respondent had violated § 8(a)(1) of the NLRA by interrogating and surveilling employees.

In addition to Mangal's testimony about these specific instances, petitioner has submitted the affidavit of Nelson Resto, which details his efforts to organize the Key Food employees. Pet. ex.B. Resto claims that after respondent failed to recognize and negotiate with the Union, he began to stand outside of the store handing out leaflets and speaking with employees. *Id.* at 1-2. He eventually had to enlist the help of Mangal to communicate with employees, and also had to meet with employees at a nearby restaurant because a Key Food manager named Dave was watching employees as they left the store. *Id.* at 2. Eventually, after Resto and the Union filed the petition for certification, employees stopped speaking to him altogether. *Id.* at 2-3. One unnamed employee stated that she did so because her hours were being cut. *Id.* at 3. Another told Resto that she feared getting in trouble with respondent and losing her hours. *Id.*

In September 2011, Union representatives began distributing a different flyer outside of the store. The new flier stated that "KEY FOOD IS ENGAGING IN AN UNFAIR LABOR PRACTICE BY REFUSING TO RECOGNIZE AND BARGAIN WITH LOCAL 338, AND BY

5

UNLAWFULLY HARASSING AND TERMINATING EMPLOYEES WHO EXERCISE THEIR U.S. LABOR RIGHTS." R. ex.2. According to Sam, at the beginning of October 2011, an employee gave him a petition signed by thirty-nine employees. Tr. 220-21. The petition indicated that the employees did not wish to be represented by the Union. Pet. ex.C.

On October 31, 2011, the Regional Director issued a consolidated complaint on the two complaints discussed above. The Regional Director then amended this complaint on January 13, 2012, and an administrative hearing was conducted on February 1, 2012 and February 7, 2012.

## DISCUSSION

*I. Standard for Section 10(j) Relief*

Section 10(j) of the NLRA provides, in relevant part, that "the Board shall have power, upon issuance of a complaint . . . charging that any person has engaged or is engaging in an unfair labor practice, to petition any United States district court . . . for appropriate temporary relief or restraining order." 29 U.S.C. § 160(j). "To warrant the granting of relief under this section, the district court must find (1) reasonable cause to believe that an unfair labor practice has occurred; and (2) that granting injunctive relief would be just and proper." *Silverman v. J.R.L. Food Corp.*, 196 F.3d 334, 335 (2d Cir. 1999) (internal quotation marks omitted).

In conducting the "reasonable cause" inquiry, a district court "need not make a final determination that the conduct in question is an unfair labor practice." *Silverman v. Major League Baseball Player Relations Committee, Inc.*, 67 F.3d 1054, 1059 (2d Cir. 1995). The Second Circuit has made clear "that the Regional Director's version of the facts should be sustained if within the range of rationality, that inferences from the facts should be drawn in favor of the charging party, and that even on issues of law, the district court should be hospitable to the views of the General Counsel, however novel." *Kaynard v. Mego Corp.*, 633 F.2d 1026,

1031 (2d Cir. 1980).  The District Court "should decline to grant relief only if the NLRB's legal or factual premises are 'fatally flawed.'" *J.R.L Food Corp.*, 196 F.3d at 335.

"[I]njunctive relief under § 10(j) is just and proper when it is necessary to prevent irreparable harm and to preserve the status quo." *Hoffman v. Inn Credible Caterers, Ltd.*, 247 F.3d 360, 368 (2d Cir. 2001).  "While this standard preserves traditional equitable principles governing injunctive relief, [a court must be] mindful to apply them in the context of federal labor laws." *Id.*

## II. Section 8(a)(5) Violation

Under § 8(a)(5) of the NLRA, it is an unfair labor practice for an employer "to refuse to bargain collectively with the representatives of his employees." 29 U.S.C. § 158(a)(5).  Petitioner claims that respondent violated § 8(a)(5) when it failed to recognize and negotiate with the Union after union representatives demanded that it do so.  Petitioner asks the Court to order respondent to bargain with the Union.

### A. Reasonable Cause

Petitioner alleges that union representatives twice demanded that respondent recognize and bargain with the Union.  The first alleged demand was made by Jeff Laub to Mike Hassen on April 26, 2011 at another Key Food on Lefferts Boulevard.  The second was made by Jack Caffey to Sam Hassen at the Key Food on Lefferts Boulevard that is the subject of this litigation. If either of these demands was legally sufficient, respondent was required to bargain with the Union.  Applying the customary deference due the petitioner in a § 10(j) proceeding, the Court concludes that the April 29, 2011 demand was sufficient to trigger respondent's obligation. Accordingly, because it is undisputed that respondent has not satisfied its obligation to recognize

and negotiate with the Union, petitioner has established reasonable cause to believe that an unfair labor practice has occurred.

In this case, respondent's collective-bargaining obligations arise from its status as a successor to Foodtown, the previous employer. "An employer succeeds to the collective bargaining obligations of a predecessor employer if (1) there is 'substantial continuity' between the two employing enterprises; and (2) a majority of the successor's employees in an appropriate unit were also employed by the predecessor." *Torch Operating Co.*, 322 NLRB 939, 941 (1997); *see generally Fall River Dyeing Corp. v. NLRB*, 482 U.S. 27, 41 (1987). Respondent concedes that it has stipulated to facts under which it was a successor—and therefore obligated to bargain upon a valid demand—by May 2011. Resp. at 2 n.2. And although at oral argument it initially argued that it contested the timing of the alleged demands as premature, it later conceded what is clear under Board law, that an otherwise adequate April 29 demand would have triggered respondent's bargaining obligation when respondent attained successor status on May 1, 2011. *See Fremont Ford Sales, Inc.*, 289 NLRB 1290, 1295 (1988); O/A Tr. at 23-27.

Respondent asserts two arguments against the adequacy of the April 29 demand. First, it attacks petitioner's version of the facts. Sam Hassen admits that he and Caffey had a conversation on April 29, but he disputes the content of that conversation. According to Sam, their conversation lasted only a minute and Caffey merely asked to speak with Mike. Tr. 244. Caffey did not tell Sam why he wished to speak with Mike, and Sam never asked. *Id.* Sam claims that Caffey never demanded that he negotiate a contract. Tr. 213, 232.

Respondent also points to a number of things the Union did or did not do that it argues are inconsistent with the claim that the Union had made a valid and outstanding demand. Chief among these is that when Nelson Resto filled out the petition for union certification, he did not

8

check the box to indicate that a demand had been made. Respondent also argues that if the Union had indeed made a valid demand, it would have memorialized that demand in writing; would have filed a complaint sooner; would not have petitioned for certification and a Board-administered election; and would not have distributed a flier that failed to mention respondent's alleged refusal to bargain. Respondent maintains that the Union never made a demand, instead seeking certification through an election, and that upon discovering that it lacked majority support, the Union fabricated the alleged demands as a last-ditch effort to win recognition.

Respondent fails to expose a fatal flaw in petitioner's view of the facts. The Court's task in conducting the "reasonable cause" inquiry stops short of resolving the credibility of witnesses. *See Kaynard v. Palby Lingerie, Inc.*, 625 F.2d 1047, 1051 n.5 (2d Cir. 1980). Accordingly, the Court accepts Jack Caffey's account of his April 29 conversation with Sam Hassen.

The Court is also not persuaded that the Union's actions or omissions are necessarily inconsistent with petitioner's claim that Caffey made a clear demand. As to Resto's failure to check the box indicating that a demand had been made, respondent has provided no authority converting this omission, as easily explained by clerical oversight as by the absence of a demand, into a legally binding admission.[2] Similarly, respondent has offered no authority suggesting that a demand must be or ordinarily is memorialized in writing and followed immediately by a complaint. The Union's claim that it did not do so because it viewed another path to recognition—organizing employees, distributing leaflets, and petitioning for certification—as a better option is at least plausible. In accordance with the standards the Court is required to apply

---

[2] Caffey admitted at the administrative hearing that he did not know why Resto did not check the box. Tr. 40. He did, however, testify that in ordinary organizing drives—many of which presumably occur in the non-successorship context—the Union does not make a formal demand until it files union cards with its petition for certification. Tr. 57-58. If this is so, it seems entirely plausible that Resto's omission is a result of mere force of habit. It is also entirely possible, as Caffey seemed to suggest, that Resto was unaware that a demand had been made. Tr. 56. The Court need not choose among these competing inferences. It is enough that each is as plausible as the inference that no demand was made.

on this application, the Court likewise declines to infer from the absence of a reference to the demand on the leaflets that no demand was made.

Respondent argues alternatively that even if the truth of Caffey's account is assumed, Caffey's statements to Sam did not constitute a valid demand.  Respondent relies principally upon case law from the D.C. Circuit. *AT Systems West, Inc. v. NLRB*, 294 F.3d 136, 139 (D.C. Cir. 2002); *Prime Service, Inc. v. NLRB*, 266 F.3d 1233, 1238 (D.C. Cir. 2001); *Williams Enter., Inc. v. NLRB*, 956 F.2d 1226, 1233 (D.C. Cir. 1992).  Those cases recognize that "although a union need utter no particular words to convey its demand for bargaining, a valid bargaining demand nevertheless must contain more than merely a suggestion that the parties should meet to discuss representation." *AT Systems*, 294 F.3d at 139 (internal quotation marks omitted); *see also Prime Service, Inc.*, 266 F.3d at 1238.  "If a union's communications to an employer do not explicitly demand bargaining, a refusal-to-bargain charge cannot be sustained unless there is some indicia of a demand, such as a suggested meeting place and time, proposed topics, and a method for reply." *AT Systems*, 294 F.3d at 139.

Applying the requisite deference to the Board's view of the law, the Court finds that Caffey's demand was sufficient under the case law cited by respondent.  According to Caffey, he explicitly (1) "demanded recognition because [the Union] had the majority of the employees;" (2) expressed the need to "sit down and negotiate a particular contract;" (3) assured Sam Hassen that the contract did not have to be identical to the Foodtown contract, and that the parties could "negotiate a contract that works for both the union and also the new owners;" (4) stressed that time was of the essence and requested that Mike Hassen, with whom Sam said he would have to confer, call within one week; and (5) left his business card as a method for reply. Tr. 36-37. Caffey's statements, replete with an explicit request, timetable, and method for reply, constitute a

10

"request clearly indicat[ing] a desire to negotiate and bargain on behalf of the employees in the appropriate unit concerning wages, hours, and other terms and conditions." *MSK Corp.*, 341 NLRB 43, 45 (2004). Under the circumstances, Hassen "understood or reasonably should have understood" that Caffey was asking that respondent, as successor to Foodtown, "recognize the Union and sign a union contract." *Id.*

Deferring to the Board's view of the facts and law, as it must, the Court finds that Jack Caffey's statements to Sam Hassen on April 29, 2011 were sufficient to trigger the bargaining obligation that arose by May 2011 from respondent's status as a successor employer. Accordingly, because respondent has failed to recognize and negotiate with the Union, there is reasonable cause to believe that respondent has violated § 8(a)(5).

*B. Just and Proper*

Having found reasonable cause to believe that respondent violated § 8(a)(5), the Court now turns to whether an order requiring respondent to bargain with the Union is "just and proper." Petitioner argues that "interim bargaining is essential to restoring the status quo ante, preventing irreparable harm to the unit employees, preventing the irreparable loss of support for the Union, and preserving the Board's remedial authority." Mem. in Supp. at 17. In support, it relies upon a Second Circuit case called *Hoffman v. Inn Credible Caterers, Ltd.*, 247 F.3d 360 (2d Cir. 2001). The Court concludes that *Inn Credible Caterers* controls this case and therefore orders that respondent bargain with the Union.

In *Inn Credible Caterers*, respondent Inn Credible Caterers ("ICC") refused to bargain as a successor with the Union ("the Local 100") that had represented its predecessor's employees. 247 F.3d at 363. Two months after the Union made its demand, an employee gave ICC's president a letter purportedly signed by 51 of its 81 employees stating that those employees did

11

not wish to be represented by the Local 100.  The Local 100 filed a complaint alleging violations of § 8(a)(1) and § 8(a)(5) of the NLRA.  The court found that the ICC, as a successor, had assumed its predecessor's collective bargaining obligation, and that it had wrongly refused the Local 100's valid request for recognition and bargaining. *Id.* at 363.

The Court next considered whether a bargaining order was "just and proper."  The Court stated that "the appropriate test for whether harm is irreparable in the context of § 10(j) successorship cases is whether the employees' collective bargaining rights may be undermined by the successor's unfair labor practices and whether any further delay may impair or undermine such bargaining in the future." *Id.* at 369.  It explained that "[i]n the context of successor employers who can damage employee confidence in preexisting unions by simply failing to recognize them until after they have hired an alternative non-union workforce, there is a pressing need to preserve the status quo while the Board's final decision is pending." *Id.*  And it made clear that "[i]n this Circuit, the appropriate status quo in need of preservation is that which was in existence before the unfair labor practice occurred." *Id.*  Finding that "[b]y [ICC's] own violation of the Act, [it] was able to hire a non-union workforce and thereby threaten to weaken severely, if not destroy, the power of the predecessor's employees to assert their bargaining rights," the Court ordered bargaining. *Id.*  It also rejected the ICC's argument that the post-violation letter from its employees—"purportedly expressing a collective desire not to be represented by [the Local 100]"—established that a bargaining order was not just and proper. *Id.* at 370.

The facts here are very similar to those in *Inn Credible Caterers*.  Respondent stipulated to facts establishing that it had a duty to bargain, upon a valid demand, by May 2011. Resp. at 2 n.2.  Its failure to comport with this duty is a labor violation.  By its own violation, respondent has had the opportunity to take additional actions to undermine the collective bargaining rights of

its employees.  For example, it has assembled a workforce in which former Union members are now a minority and has committed additional labor violations, *see infra* Section III.A, which Nelson Resto claims have resulted in diminishing union support even among former Foodtown employees.  As in *Inn Credible Caterers*, the only way to prevent this irreparable harm is to restore the status quo as it existed prior to the violation.

Instead of seeking to distinguish *Inn Credible Caterers*, respondent argues that petitioner's delay in seeking § 10(j) relief establishes that interim relief is unnecessary.  Although it is true that agency decisions "which foreclose[] the possibility of a quick resolution of the underlying dispute . . . could properly be weighed in a proceeding for equitable relief," *Mego Corp.*, 633 F.2d at 1034, the Second Circuit has also recognized that "[t]he Board does not take lightly the commencement of a § 10(j) action," *Kaynard v. MMIC, Inc.*, 734 F.2d 950, 954 (2d Cir. 1984).  The four-month interval between petitioner's filing of the administrative complaint and the commencement of the § 10(j) action does not strike the Court as unreasonable or atypical.  Indeed, other courts have issued injunctions after far longer delays. *Paulsen v. Renaissance Equity Holdings, LLC*, 2012 WL 1033339, *25 (E.D.N.Y. 2012) (fourteen months); *Frankl v. HTH Corp.*, 650 F.3d 1334, 1366 n.18 (9th Cir. 2011); *Overstreet v. El Paso Disposal, L.P.*, 625 F.3d 844, 850, 857 (5th Cir. 2010).

Respondent also argues that a bargaining order would effectively undermine the current employees' right to organize because it is clear that a majority of those employees do not wish to be represented by the Union.  This argument is foreclosed by *Inn Credible Caterers*, which held that "lack of employee support [after a valid demand] is no defense to a violation of [the duty to bargain]." 247 F.3d at 370.  To the extent cases cited by respondent suggest otherwise, those cases are either prior to or distinguishable from the decision in *Inn Credible Caterers*, or are

from other Circuits in which *Inn Credible Caterers* is not binding precedent. *See Seeler v. J.G. Page & Sons, Inc.*, 540 F. Supp. 77, 79 (S.D.N.Y. 1982) (two-decade-old case in non-successorship context); *Mattina v. Duane Reade, Inc.*, 2005 WL 1349855 (S.D.N.Y. 2005) (since-vacated case recognizing risk that substantial turnover in several-thousand employee workforce might have resulted in lack of majority support of current employees); *Pye Young Women's Christian Association of Western Ma.*, 414 F. Supp. 2d 96 (D. Mass. 2006) (court not bound by *Inn Credible Caterers*).

Because the relief requested by petitioner is just and proper, the Court grants the petition and a bargaining order shall issue.

## III. Section 8(a)(1) Violation

Section 8(a)(1) of the NLRA provides that it is an unfair labor practice "to interfere with, restrain, or coerce employees in the exercise of [their labor] rights." 29 U.S.C. § 158. Petitioner claims that respondent violated this right by interrogating Nadira Mangal about her union activities and by creating the impression that these activities were under surveillance. Petitioner further asks the Court to issue an injunction restraining further violations of § 8(a)(1).

## A. Reasonable Cause

Petitioner alleges, based on testimony from Mangal, that Sam Hassen twice interrogated Mangal and created the impression that her union activities were under surveillance. During the first of these alleged incidents, which occurred on June 17, 2011, Sam asked Mangal how many union cards the Union had given her to have signed, told her that he had an "insider" at the Union, asked her whether she would rather pay union dues or get a "big pay check," and told her that he would give her more hours if she renounced the Union. Tr. 122-23. During the second alleged incident, which took place on June 19, 2011, Sam interrogated Mangal about whether she

14

had been writing down other employees' schedules. Tr. 124-25. This ostensibly contributed to her impression that she was being surveilled, a feeling apparently shared by other employees according to the affidavit submitted by Nelson Resto.

Interrogation violates the NLRA when "under all the circumstances the interrogation reasonably tends to restrain, coerce, or interfere with rights guaranteed by the Act." *Sunnyvale Medical Clinic*, 277 NLRB 1217, 1217 (1985). "A court making this assessment takes into account 'the economic dependence of the employees on their employers, and the necessary tendency of the former, because of that relationship, to pick up intended implications of the latter that might be more readily dismissed by a more disinterested ear." *Kinney Drugs v. NLRB*, 74 F.3d 1419, 1427 (2d Cir. 1996). Violations of § 8(a)(1) include "grants or promises to grant benefits to discourage employee support for a union, *NLRB v. J. Coty Messenger Serv., Inc.*, 763 F.2d 92, 96 (2d Cir. 1985), and "the cultivated impression that employees' union activities are under surveillance," *NLRB v. Long Island Airport Limousine Serv. Corp.*, 468 F.2d 292, 296-97 (2d Cir. 1972).

Respondent, supported by Sam Hassen's testimony, first denies that the June 17 interrogation took place at all. But the deferential standard applied on a § 10(j) petition precludes the Court from resolving in favor of respondent issues of fact that turn on the credibility of witnesses. *See Palby Lingerie, Inc.*, 625 F.2d at 1051 n.5. Respondent also points out that Mangal's prior affidavits to the Board had not specifically mentioned Hassen's statement about a "big paycheck." And it argues that Mangal's explanation for this—that the Board agent "kept pushing me and pushing me and pushing me" to remember what Sam said—undermines her credibility. But the Court does not believe that Mangal's omission of the "big paycheck" comment is fatal to petitioner's account of the facts, and the Court does not read her explanation

in the administrative transcript to be as damning to her overall credibility as respondent contends.

Respondent also argues that even if both the June 17 and June 19 conversations occurred as Mangal testified, they do not rise to the level of unfair labor practice. "Section 8(a)(1) leaves an employer . . . free to communicate to his employees any of his general views about unionism or any of his specific views about a particular union, so long as the communications do not contain a threat of reprisal or force or promise of benefit." *Id.* at 1428 (citing *NLRB v. Gissel Packing Co.*, 395 U.S. 575, 618 (1969). Respondent argues that Sam did no more than communicate these sorts of personal opinions on the drawbacks of the Union. It highlights Mangal's testimony that she and Sam were joking with each other by the end of the June 17 conversation. Tr. 123. And it argues that the June 19 conversation was merely an investigation of a complaint lodged by a fellow employee.

Although respondent's argument is not entirely without merit, when considered under the highly deferential standard applied to a § 10(j) petition, the Court concludes that there is reasonable cause to believe, given all the facts and circumstances, that Sam's conversations with Mangal were interrogations in violation of § 8(a)(1). Mangal was a former employee of Foodtown, respondent's predecessor, who was involved with the Union's attempts to continue representation of the Key Food employees. At the time of the alleged conversations, the Union was picketing outside the Key Food, distributing leaflets and, with Mangal's assistance, attempting to persuade employees to fill out union cards. Aware of all of this, Sam called Mangal into his office and told her that he had an informant at the Union—thereby "cultivat[ing] the impression that" Mangal's union activities were under surveillance—and that he could increase her hours if she withdrew from union activities—arguably promising her a benefit in

16

exchange for her labor rights. Sam's questioning two days later regarding Mangal's recording of employees' schedules could only heighten Mangal's suspicion that her activities were being watched.[3]   Given the acrimonious atmosphere pervading the labor dispute at the time, these interrogations would "reasonably tend to restrain, coerce, or interfere" with Mangal's exercise of the rights guaranteed by the NLRA.  Accordingly, there is reasonable cause to believe that a violation of § 8(a)(1) occurred.

*B. Just and Proper*

    Having found reasonable cause to believe respondent has violated § 8(a)(1), the Court now considers whether an injunction restraining future violations is "just and proper."  Petitioner contended at oral argument that such relief is necessary to preserve the effectiveness of the Board's ultimate remedy, to effectuate the policies underlying the NLRA, and to restore the status quo as it existed before respondent's unfair labor practices. *See Kaynard v. Mego Corp.*, 633 F.2d 1026, 1034 (2d Cir. 1980); *Inn Credible Caterers, Ltd.*, 247 F.3d at 368 (explaining that traditional equitable principles must be applied "in the context of federal labor laws"). Respondent's only counter-argument is that there is no evidence in the record that respondent is currently committing § 8(a)(1) violations, and thus there is no conduct to restrain.

    Although it is true that the only specific evidence of unfair labor practices dates to June 2011, the Court nonetheless finds that injunctive relief restraining future interrogation or cultivation of the impression that union activities are under surveillance is "just and proper."  For the reasons explained *supra* Part II, the Court has found reasonable cause to believe that respondent has violated the duty to bargain under § 8(a)(5), and that a bargaining order restoring the pre-

---

[3] Although portions of Resto's affidavit appear to rest upon hearsay, other non-hearsay testimony in the affidavit provides context that corroborates Mangal's testimony and contributes to the Court's conclusion that Sam's interrogation would reasonably be interpreted as coercion.

violation status quo is just and proper.  As a result of that violation and the violation of § 8(a)(1),
support for the Union has waned considerably.  These violations taken together, along with the
additional evidence of generalized coercive practices provided by Nelson Resto, suggest a
substantial likelihood of resumption of activities that undermine employees' rights under the Act.
An order restraining such violations of § 8(a)(1) is necessary to prevent further erosion of
support, to restore as much as possible the Union's pre-violation position in the store, to
effectuate this Court's bargaining order, and to preserve the effectiveness of the Board's ultimate
remedy. *See Inn Credible Caterers*, 247 F.3d at 368-69 (recognizing need for § 10(j) relief to
prevent "irreparable harm to the union's position in the [workplace], to the adjudicatory
machinery of the NLRB, and to the policy of the Act in favor of the free selection of collective
bargaining representatives").

Moreover, the Court notes that an injunction restraining the sort of interrogation or coercion
that constitutes a violation of § 8(a)(1) is consistent with traditional equitable principles.  In
addition to preventing irreparable harm and restoring the status quo, such relief is hardly onerous
for respondent, and it will in no way adversely affect the public interest. *See Mattina v.
Chinatown Carting Corp.*, 290 F. Supp. 2d 386, 295 (S.D.N.Y. 2003) (considering public interest
in § 10(j) proceeding); *Dunbar v. Park Assocs., Inc.*, 23 F. Supp. 2d 212, 218 (N.D.N.Y. 1998)
(considering the balance of hardships and the public interest in § 10(j) proceeding).

Because the relief requested by petitioner is just and proper, the petition for an injunction
restraining violations of § 8(a)(5) is granted.

18

## CONCLUSION

For the reasons stated above, the petition for relief under § 10(j) of the NLRA is granted.

Petitioner having asked that the Court order relief in the form proposed in its petition, and

respondent having failed to object to that form, it is hereby

ORDERED that Calhoun Foods LLC, its officers, agents, representatives, servants, employees, attorneys, successors, and assigns, and all persons acting in concert or participation with them, are enjoined from failing and refusing to recognize and bargain with the Union as the exclusive collective bargaining representative of the unit;

ORDERED that Calhoun Foods LLC, its officers, agents, representatives, servants, employees, attorneys, successors, and assigns, and all persons acting in concert or participation with them, are enjoined from interrogating employees about their Union activity;

ORDERED that Calhoun Foods LLC, its officers, agents, representatives, servants, employees, attorneys, successors, and assigns, and all persons acting in concert or participation with them, are enjoined from creating the impression among its employees that their Union activities are being kept under surveillance;

ORDERED that Calhoun Foods LLC, its officers, agents, representatives, servants, employees, attorneys, successors, and assigns, and all persons acting in concert or participation with them, are enjoined from, in any like or related manner interfering with, restraining, or coercing its employees in the exercise of the rights guaranteed in Section 7 of the NLRA.

Further, Calhoun Foods LLC, its officers, agents, and representatives shall:

(a) Recognize and, on request, bargain with the Union as the exclusive collective bargaining representative of the employees in the Unit, concerning terms and conditions of employment and, if an understanding is reached, embody the understanding in a signed agreement;

(b) Post copies of the District Court's order in this matter at all locations where respondent's notices to employees are customarily posted; maintain such notices free from all obstructions or defacements pending the Board's administrative proceeding; and grant to agents of the Board reasonable access to respondent's facility to monitor compliance with this posting requirement; and

(c) Within twenty (20) days of the issuance of this Order, file with the District Court and serve a copy upon the Regional Director of Region 29 of the Board, a sworn affidavit from a responsible respondent official which describes with specificity how respondent has complied with the terms of this decree, including the exact locations where respondent has posted the materials required under this Order.

SO ORDERED.

Dated: April 24, 2012
      Brooklyn, N.Y.

                                  s/CBA

                                 Carol Bagley Amon
                                 Chief United States District Judge